253706 Mark Pannek v. US Bank National Association Arguments not to exceed 15 minutes Good morning Good morning, Your Honor Thank you, Judges Patchelder, Griffin, and Mathis, and may it please the Court. I'd like to reserve two minutes for rebuttal. Very well. Your Honors, we are here today on an appeal of the District Court's summary judgment decision in favor of US Bank on plaintiffs' Title VII and ADEA claims. I want to note first that this is a very old case. It went through four district judges' transfers. It was pending a summary judgment decision for a number of years. Obviously, the appellants disagreed with that decision, but we do appreciate the Court's time in considering the issues today. I'm going to primarily address the retaliation claim in this case, but I'm happy to answer any questions about the other claims, including the hostile work environment or the ADEA claims. At a high-level summary, this case concerns two high-performing VPs at US Bank by all objective measures that were jointly recommended for termination by their supervisor, Senior Vice President Brian Bolton. That recommendation was made just four days after Mr. Bolton was made aware that one of these plaintiffs had filed an internal ethics hotline complaint alleging discrimination and hostile work environment. I assume you're referring to the April 2nd email as being when he referred them for termination. That's correct, Your Honor. That's exactly right. But doesn't he testify that he discussed terminating them going back maybe to March or February that he was thinking about terminating them at that time as well? Judge, that's a great question, too. He provides a declaration on summary judgment that he had made preliminary decisions during a four-week period that he estimates to be late February to early March. Now, that is important because it is contradicted by his deposition testimony where he indicates I didn't make any decisions until he estimates again the April time frame. Well, isn't he talking about a final decision at that point? Judge, they have tried to couch it as that, but there are no indications that he made any preliminary decisions prior to April 2nd. There is no email, there is no written communication that states I am thinking about terminating these two individuals prior to April 2nd. That April 2nd email is the first time we hear Mr. Bolton tell HR executives that I am recommending these two for termination. Okay. You know, the whole theory of retaliation, because he complains about the inappropriate behavior of Jim Rich and your theory is that because he complained about Jim Rich, they retaliated him, but they punished Jim Rich by giving him a warning letter right afterwards. They ultimately terminated him like other grounds. I mean, it doesn't look like U.S. Bank really cared that much about Jim Rich and to think that they take all these actions to protect Jim Rich because they are angry that your clients have accused him of this thing, it just doesn't seem to make a lot of sense, that's all. I mean, I know it's your theory, but it doesn't seem like that kind of conduct would result in the retaliation when they didn't really care for the supervisor either. So, I mean, why would you expect a reasonable company to react like that under your theory? Judge, the reason we would suspect that is because while Mr. Jim Rich, correct, he was given a written warning at the same time. Ultimately fired. And, you know, so actually this email we're talking about, Bolton said he was glad or he welcomed the complaint because these allegations are serious or whatever. It was kind of like, okay, I'm kind of glad we got this complaint that we can look at them. I mean, it doesn't look like they're protecting them, that's all. Yeah, and Judge, happy to address that. The email does, Mr. Bolton indicates to HR, who is going to be investigating this, he's glad that Mr. Panek raised these concerns. He's glad he made charges. And then your theory is, all right, he's glad he made charges, but guess what? I'm going to retaliate against him because he made the charges, even though I'm glad he did it. It doesn't seem to make sense. Well, Judge, if we read the rest of the email, though, including I believe it's in the same sentence, he indicates these two are concerned about their jobs. They're worried about their jobs, and I question the timing of this code of ethics violation. He states that in the same email. Not really the substance of it. I mean, the substance, they kind of, yeah, I'm glad they raised it because they warned him about it that they might have agreed with it, that's all. And, Judge, I would agree with you that he, I don't know that he agrees with the substance of it. I know, but, I mean, he's not upset with it. Right. And normally in these retaliation cases, they make a charge, it's embarrassing to the company, they're, oh, how could you accuse this guy of doing this? Well, here they got the charge, and they say, oh, man, maybe it's got some merit here, and we'll end up letting this guy go that they charged. Just tell, you have to convince us that a reasonable jury could find pretext. Their legitimate non-discriminatory basis is the reduction of force, which is a very strong one, and you have to convince us that a reasonable juror could say, no, this is pretextual. And does that, you know? Absolutely happy to address that, Judge. First of all, there is the timing, which I was discussing, but there's other probative evidence as well. You referenced that the reason they terminated these two, the reason they stayed, was a reduction in force based on a corporate reorganization. For one thing, U.S. Bank has a mandatory policy relating to reductions in force called their peer group analysis. Mr. Bolton, on April 2nd, is recommending termination before he has started the actual process of that, the peer group analysis, the identifying of skills, the scoring of candidates, comparing one candidate to another. He's already made this recommendation on April 2nd, and in the weeks that follow, then they start doing this process. But, again, he skips step after step. And this court has been clear that failures to follow processes that result in a prejudice to a plaintiff are also evidence in indicia of pretext. Wasn't there some testimony in the record that maybe the process didn't have to be followed? There was some HR rep that testified that certain managers, or not certain managers, but sometimes you don't have to follow that process. Absolutely right, Judge Mathis. I believe one of the HR may have been Ms. Watson. I can't remember offhand, but someone did. You're correct about that. I would submit, though, that's a disputed fact. That is testimony on the one hand, while we have a policy saying this is mandatory on the other. And at the same time, there's also testimony from that same HR executive that a peer group analysis is typically supposed to be completed before we make any decisions about termination. And that's not what occurred here. Okay, so you've got temporal proximity. You've got them failing to go through all the steps that they're supposed to go through. Is that it? No, Judge, there's more. There were open and available positions, two of them on the team. What exactly is the action that triggers the retaliation? And I guess by that I mean at what point did your clients bring up Title VII protected activity that they complained about? Great question, Your Honor. I love asking that. The ethics complaint itself, there's a summary of that, which indicates right on the form there's categories where it says who. Mark Panik complained about John Gimrich. What? It states discrimination. Well, yeah, but discrimination doesn't necessarily mean Title VII protected activity. You can discriminate against people for all kinds of things. They have red hair, you know. So at what point is this Title VII protected activity that was being complained about? Judge, it is the ethics complaint. But, Mr. Panik, that is Title VII protected activity. I understand discrimination doesn't – Any ethics complaint, no matter what the substance, the ethical violations maybe were, that's protected under Title VII or does it have to relate to actual Title VII type of protected activity? For example, race, sex, whatever. It can't just be in general, this guy's just offensive and I don't like him. Yeah. Judge, of course, it does have to come within the comports of Title VII. It does not – you do not have to prove there was an actual violation, but the plaintiff has to have a good faith belief, reasonable belief that this was a Title VII violation. I'm sorry. What is it that really ties this down to Title VII? Yeah, it is the complaint and it references a hostile work environment. This Mr. Gimrich is belittling employees. They reference Annette Tatman. Belittling employees might evidence hostility, but not protected in a protected way. I mean, you can belittle employees for all kinds of things, but unless it is for something that Title VII tells you you can't belittle them for, then that doesn't get you anywhere, and that's what I'm trying to figure out in this case. Yeah, and, Judge, the complaint, the hostile work environment, what Mr. Panek is alluding to in part – now, there's a lot in this. There's a betting incident. There's belittling employees. You don't claim that that's Title VII. That's not Title VII, correct. Okay. But the sex-based comments, the describing of his sex life, the talking about other female employees, their body parts, the describing what he wants to do with those female employees, that is all. But these are men. I mean, you know, he's doing sexist comments against women. So is this a violation of his Title VII rights, the fact that he's sexist against the other sex? Well, Judge, respectfully, that's a bit beside the point because what they're complaining about is a hostile work environment at U.S. Bank because of this individual. Now, they were offended by these comments. They concerned them. They were disgusted by them to the point that they were seeking to transfer out. That's related to the hostile work environment claim, but they are complaining about it more generally because female employees are being harassed. They're being belittled in e-mails, and these comments are a part of that as well. We're seeing a harasser who is treating women and making comments about women that are offensive to women. Okay. This is kind of far afield. I just wonder if he has standing to enforce the rights of the women in the workplace when he's a fellow man and the fellow man is doing it. Yeah, Judge, I would submit that they do simply because an employee is a man and he sees harassment going on, he sees a hostile work environment on the basis of sex or gender. Simply because that is a man who is making a good-faith complaint about that in the hopes that his employer will address it, they would still have standing in this case. I would submit that. I don't have a case on hand for that, but I'm happy to submit that if needed. Your Honors, the main issue in what I want to, while I'm running out of time, the district court made a contradiction in its decision, which is that it did find that the timing supported the plaintiff's case and created a causal connection. And you can see that on the decision, page 2716. That was for the Prima Facie case, was it not? That's correct, Judge. Then he ruled the other way as to the pretext part of it, right? That's exactly right, and that's what I see. He can't do that? Well, that is my point, Judge. I think it creates an inherent problem in that he is providing the opinion that, yes, the timing of this, and I'm going to quote it, this is page 2716. While Bolton formed some opinions about panic enstrapment over the course of February and March of 2018, the record evidence indicates he did not come to the view that he intended to terminate them until April 2, 2018, at the earliest. And at the same time, in the same breath, he goes on to say, well, under the pretext analysis, I'm disregarding all of that. I find it actually supports U.S. Bank. Now, I don't, the only reference is to a February email, which does not say anything about termination. It references some employees that will go to another employee, but there's no indication I'm planning to terminate these two under a reduction force. No peer group analysis had been performed. None of those steps had been engaged in. And so I think, given that contradiction, there appears to be a clear issue of fact that the district court did recognize, and yet on the pretext analysis, without much logic, determined, well, that's no longer relevant. That no longer shows pretext. All right. Any further questions for Mr. Smith at this point? You can use your two minutes rebuttal now if you want, or you can say it. That's okay, Judge. I'll reserve it. Okay. Very good. You'll have the two minutes. Good morning. Good morning. May it please the court. My name is Patty Pryor, and I'm here on behalf of U.S. Bank today. The defendant, Appellee U.S. Bank, respectfully requests that the court affirm the judgment of the district court in all the counts here. I'm going to address the retaliation claim, too, as that is what the opponent has brought up. I think you have to first look at what this case is. And my colleague, or my opponent here, raised this as these are well-experienced, great employees. They'd only been employed, Mr. Panek had only been employed less than six months when Mr. Bolton took over and was charged with combining these groups. Let me ask you, does U.S. Bank dispute that they engaged in protected activity through the ethics complaint? Is there any dispute about that? We would dispute that there was any knowledge of protected activity by the decision maker with just the ethics complaint, because as Judge Griffin pointed out, there is no reference in that complaint that U.S. Bank received or that Mr. Bolton received that would suggest it was because of any protected category. Right. So where in the briefing does U.S. Bank challenge that? The way I read the briefing is U.S. Bank challenges causation and they challenge pretext. But I see no challenge that there was no protected activity. Well, at some point there was, because, you know, the complaint did include, I think, you know, I don't think we have any dispute on our side, at least at this point, that he may have verbally, I think he testified, he verbally told the ethics hotline that there was, about these sexual comments. And then at some point during the investigation, the U.S. Bank folks who were involved would have learned that. But I don't believe it was that at the time. I don't know that it's in the briefing. I would concede that, Your Honor. Because I think there's so many reasons, there's so many reasons why the court should be affirmed here. And that would be another one as well. Yeah. But you haven't appealed the lack of protected activity, have you? No, we haven't appealed that. Okay. No. I think that's what judges argue. Yeah. No, I apologize. Yeah. But this case is one. There just simply is no retaliation involved. There's no evidence of any retaliatory motive. Okay. Well, I was going through the steps that they do have temporal proximity, and they do have failure to follow all the steps that they're supposed to. Why isn't that enough? Yeah. Well, so, one, the temporal proximity is not there because there is this court, and the Supreme Court has made very clear, when the writing is already on the wall, then that temporal proximity is not enough to get you anywhere. And that's exactly what was the case here. How is the writing already on the wall when it's the April 2nd email where Bolton says, I'm going to include them in the severance exercise, which is obviously after the complaint's been made? That's when there is a written thing. But Bolton testified multiple times in his deposition and in his declaration that this consideration he'd already made the determination in February or early March. And he says that multiple places in the testimony. I thought his final decision wasn't until later. Exactly correct. The final decision isn't until later. Okay, isn't the final decision, is that what's critical, or a preliminary decision? Yeah, it's a preliminary decision. Just the contemplation of it is enough under this court's jurisprudence and that of the Supreme Court is enough to show that that temporal proximity is meaningless for this. I mean, it seems like the April 2nd email should say, well, I've already included them in the severance exercise, rather than I'm going to include them in the severance exercise, if the decision had been made in February or March or whatever the case may be. I don't recall that exact wording, but I'm not going to dispute that. But I think the point is, though, that he has already, by that point, he's already determined that he's got to, essentially what happened, and I think we need to go back to that. Essentially what happened is you're combining groups under Mr. Bolton. Mr. Bolton didn't know Gemrecht before. He didn't know these two individuals. These two individuals had barely been at U.S. Bank very long. And since they'd been there, they'd gone through four different supervisors. At least one of them had gone through four. I think Mr. Panik had gone through three. And their positions had already been scrunched. So Mr. Strotman originally was over Mr. Panik. When he went under Mr. Gemrecht in November, under the first restructuring, he lost authority over Mr. Panik. In other words, he lost a group out of him. He testified, Mr. Strotman testified, that in January, before Bolton talked to him in February, they had already taken away from him the quality group that was under him, which he had testified was the largest group under him. So already, and according to Mr. Strotman's testimony, they'd already taken away Panik's group from him, and now they'd taken away the quality group, which he said was the largest group, and that had gone to Gemrecht. So they'd already shrunk him down. Same thing with Mr. Panik. The only group that was going to be left under Mr. Panik, under Mr. Bolton, was going to be the third party, the vendor management, which was only about 20% of what he did. And as a result, I mean, the writing's on the wall because they don't have anything left to their jobs. That's already there. And then you've got, on top of that, you've got Mr. Bolton's testimony, which is unrefuted, that in February and early March, I was already of the opinion that these two were not going to be the leaders of my group. And why? And this part is important because it's not disputed. What's the point of the peer group analysis? If you're saying the writing's already on the wall, everything's done, you know, they've lost whatever's under them, what's the point of that if everything's already in place? Yes. So, one, it is not a mandatory requirement. And, in fact, even the form itself reads as, you know, this must be completed when you have two people in the same job and you're considering among them. So you've got a group of people in the same job and you're considering among them. That was not the case here. The jobs were not exactly the same. There was overlap. They were not the same jobs. So he was not required to do it, even under the policy, but also under HR. The point of it is, though, it's a double check. Why are we doing it then? If there's no combination of jobs, they're not doing the same job, why is there a peer group analysis? It's a double check. As Mr. Bolton testified, it's a check when he's done making his decision, his next step is to go to HR and get approval. And part of that process is doing the form, which he did complete. I guess I don't understand what you're double checking if you're saying there's no overlap in the jobs. No, there was overlap in the jobs. They just weren't the same. Okay. And so it was a form, as the HR testified, it was a form that was used for guidance. It was something they did complete. He did complete it. I mean, there's not this idea that he didn't follow it. He did follow the requirement. Well, aren't you supposed to do it at the front end with the HR person? He didn't do those things, right? I don't know that there's any requirement that it be done at the front end. He first has to actually do his own evaluation and assessment, and I think that's what he testified, that's what his manager testified, that's what HR testified is proper. And he did all that process, as HR testified. She said he did what he was supposed to do. He did the analysis. He actually had the folks come in together and kind of talk amongst themselves. He had another third party, Ms. Votel, kind of come in and kind of monitor it. And out of all that is where, you know, again, this is all the reason why they were selected is all undisputed. You didn't hear anything from him say that, hey, the reasons they were selected, the fact that they hadn't been there that long, the fact that their jobs had been whittled down to very little in terms of what was going to be under Mr. Bolton. The fact is you'll see in Mr. Bolton's email, he'll say that, look, a lot of the job of Mr. Panek had already been moved to other people, and those other supervisors had already rejected him. They didn't want him in their groups outside of Mr. Bolton. And so these facts are undisputed. It's very clear why the decision was made. The idea that I can file a complaint, that complaint goes to the company and my manager sees it and that somehow blocks me from being terminated is what they're trying to have this court do, and that's just not allowed. And there's not any evidence that there was a retaliatory motive. There's not any evidence of pretext. There's not any, I mean, a squabble about whether or not the form should have been done at the very beginning or at the very end does not create a retaliatory motive because it is very clear he was doing the process. He did come to the decision. You've got a February 22 email where he basically tells the person that's going to take over what's left of Mr. Panek's role, you're going to take over these people, put together your thing, put together your chart on it. That's in February 22. That's a full month before any complaint is made. So it's, you know, the process was in place. He was doing the right steps. He was doing those steps before. I mean, the decision not to use the form came way before any complaint. Not to use the form at the very beginning came way before any complaint. The decision not to use the form came before a complaint. So the form was, he didn't use the form until April. But he had already started the process. He had already started moving things away from these individuals in February. So that's before the, so he hadn't used the form in February. That's before the complaint. When did he use the form? He used the form after the complaint and after when he was at the point of talking with HR because in his view, if you read his testimony, in his view the process was he comes to a decision, his next step is to go to HR, and that's when you use that form. And that's what he did. And there's no evidence that he's done it any other way with anyone else. Nor is there any evidence that anyone else did it any other way with anyone else. So he did this consistently with other employees? He did it with the whole group, yeah. Again, there's no evidence that he's done it any different way with any other time he's had to make decisions. So, again, going back to the, I mean, it really is simply on the retaliation side. The reasons why they were let go, the fact that they were very short-term there, they had not yet had a proven track record at U.S. Bank. A lot of their duties had already been moved to groups outside of Mr. Bolton's control, so they had a limited scope. When he was considering Mr. Panek, he's looking at one of his star employees as the person that he'd be competing against. He likes her. He's worked with her. He knows her. He trusts her. He chose her very early on in the process, and that's why you see that February 22 email to her saying, hey, you're going to take over these people. Mr. Smith said that the district court's ruling as to the timing was inconsistent, that the district court ruled one way as to the prima facie case and a different way as to pretext. How do you address that? I think, one, the district court could have ruled even on the prima facie case and found no prima facie case. But I also think it's not unusual. The mere fact that there's a temporal causation, the mere fact that you hit the prima facie case does not mean you get pretext. Otherwise, there would be no argument for pretext. But if it's a factual finding, it doesn't have to be consistent? I don't know that, well, I don't know there's any factual finding. I think it was a, on the record, what he determined was on the record, the final decision wasn't, and I would agree with that, the final decision was not done before the protected activity. The final decision came after. But under this Court's jurisprudence and the Supreme Court's jurisprudence, the fact that it was contemplated before, which, again, is undisputed, there's no evidence to dispute the fact that Mr. Bolton had contemplated this before on April 2nd. He put it in writing on April 2nd, but he had contemplated before that. He'd gone through all the steps. He'd already actually moved things away from these individuals, and he'd already done the analysis, which was part of this synergizing group where he had the folks doing it. So that was already done, and at that point, for the pretext argument, it's just not enough. That temporal proximity is just not enough at that stage of the process. Any other questions? No. Thank you, Mr. Breyer. For rebuttal, Mr. Smith, two minutes. Thank you, Your Honors. There were references to no evidence of a retaliatory motive. As these cases typically go, we have circumstantial evidence. We don't have a smoking gun. No one's admitting, yeah, we're going to retaliate against them for filing this complaint. But we do have circumstantial evidence here, enough to show pretext. Temporal proximity, which we've addressed. The failure to follow the PGA process, which I'll note. Did he fail to follow that for the other employees as well? Not only your clients, but the other ones as well? He did, Your Honor. With respect to Ms. Roberts. He did fail to follow for the other? He did not follow the process. This is the way he operated then. So to say that circumstantial evidence that he's retaliating because of his failure to do the process, that doesn't really apply, does it? No, I'm sorry. Because this is the way he operates. Judge, there's a distinction between U.S. Bank has a policy that has to be followed. When there's two or more employees that are going to be eliminated, he doesn't follow that process. It results in prejudice to the plaintiff, who may have otherwise retained their jobs. Now, I'm not saying that he consistently did not follow the process and skipped over steps every single time. I'm indicating there is one other employee that he compared Mr. Panek to, Allison Roberts, who he also didn't follow the process for. He didn't look at a performance review. He indicates he may have, but there's no performance review in the record from 2017 that he was supposed to look at, yet he put a score on that. And beyond that failure to follow the PGA process. Is this around the same time where he didn't follow a process for Roberts as well as didn't follow the PGA process for the plaintiffs? That's right, Judge. Yeah, it's the same time because he's doing a comparison between Roberts and Panek, and yet he's putting in scores without looking at actual performance reviews, without involving HR in that process. Is there evidence of how he conducted PGA processes maybe before this particular reorganization process? No evidence I'm aware of, Judge, but I do want to note Mr. Gimrich, because we had talked, Judge Griffin, about he was terminated a year later. Part of the reason, and this is in the record, he was terminated was failing to follow the PGA process. The bank takes this seriously, and the indication in that investigation, the result is that it may have resulted in two employees being terminated that shouldn't have been because he didn't follow that process. We're not talking about the two plaintiffs here, but it's a year later. He does a RIF under a PGA. He doesn't follow the process. The bank terminates Mr. Gimrich for it. I'm out of time, Your Honors, unless there's any other questions. You can wrap it up. I'll give you another minute if you want. Yeah, great. Well, the other point Ms. Pryor had indicated, these folks hadn't been here long. That's not relevant to retaliation. Simply because someone hadn't been at the bank for 20 years, that doesn't mean they don't have a retaliation claim when they engage in protected activity. At the same time, Mr. Stratman was awarded, just in the six months prior to his termination, he was given an award to the top 1% of performers at U.S. Bank called the Legends of Possible Award. He was given a positive review by his prior supervisor that was given to Mr. Bolton by Mike Ryan, wrote a letter on his behalf. And yet, these two are terminated. And there's open and available positions. And these two are terminated. They're told that it's pursuant to a reduction in force, and yet there's continued claims. There's no retaliatory motive. There's no evidence of retaliation. This decision was already made in February. And as a very final point, the February 22nd email that's been alluded to as the sole piece of evidence that this was already an established decision, that has nothing to do with Mr. Stratman. It only has to do with Mr. Panek, and it says nothing about a termination. Thank you. Any further questions? No. All right. Thank you, Mr. Smith. The case will be submitted.